UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| THOMAS A. SCHWEITZER | : | |
| | | Case No. 1:C-1-02-052 |
| Plaintiff, | : | |
| | | Judge/Magistrate Hogan |
| vs. | : | |
| | | |
| TEAMSTERS LOCAL 100 | : | DEFENDANTS= REPLY TO PLAINTIFF=S MEMORANDUM |
| Defendant. | : | IN OPPOSITION TO DEFENDANT=S MOTION FOR SUMMARY |
| | : | JUDGMENT |

:::::::::::::::::::::::::::::::::::::::::::

**I.   PLAINTIFF REMAINS UNABLE TO PROVE HIS FEDERAL AND STATE DISCRIMINATION CLAIMS**

Plaintiff challenges Defendant=s assertion that he cannot prove his age discrimination claims by asserting that 1) there is direct evidence that Defendant discriminated against him on the basis of his age thereby relieving him of his responsibility to prove a *prima facie* case; 2) that he can prove a *prima facie* case; and 3) that Defendant=s reason for terminating Plaintiff is pretextual.  *Plaintiff=s memorandum at 13, 14 and 18*.

**A.   Plaintiff can offer no direct evidence of age discrimination**

The Sixth Circuit Court of Appeals has defined direct evidence of discrimination as follows:

> [D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926

1

(6th Cir. 1999) (citations omitted).

*Hopson v. Daimler-Chrysler Corp.*, *306 F.3d 427* (6th Cir. 2002). Plaintiff=s assertion that Barnes told him, prior to his termination, that he Awas being paid less than Harry Gabbard because Barnes thought I was only going to be around for a couple of years@ does not meet *Hopson=*s requirement for direct evidence in light of Plaintiff=s status as a part time employee. *Plaintiff=s affidavit at & 6; Affidavit of Kim Bales; Plaintiff=s deposition at pp. 52, 100; Plaintiff=s deposition, Exhibit 3 at p. 153; Exhibit 1, attached hereto.*

Plaintiff=s affidavit regarding his alleged full time status is not direct evidence of discrimination where, as here, the affidavit is contradicted by Plaintiff=s other sworn statements. The court should ignore them as an attempt to create a sham issue of fact and a desperate attempt to avoid summary judgment. Aside from the obvious hearsay contained in the affidavit, such a sworn statement directly contradicts Plaintiff's assertion that <u>he was a "Part time" employee</u>. *Id.* Plaintiff authenticated a document HE supplied the information for and declared himself a part time employee. *Plaintiff=s deposition at 100; Plaintiff=s deposition, Exhibit 3 at p. 153; Exhibit 1, attached hereto; Plaintiff=s affidavit at & 6; Affidavit of Kim Bales; Plaintiff=s deposition at pp. 52, 100; Plaintiff=s deposition, Exhibit 3 at p. 153; Exhibit 1, attached hereto.* Defendant posits that such an issue cannot be "material" for purposes of Rule 56. In any case, while an issue of material fact can be founded upon contradictory evidence between a plaintiff and a defendant, such a material issue of fact cannot be based upon a plaintiff contradicting himself in sworn statements.

### B. Plaintiff remains unable to make out a *prima facie* case.

In his brief, Plaintiff attempts to show that he is able to make out a *prima facie* case by attacking Defendant's assertion that Plaintiff's job was eliminated as part of a reduction in force (RIF). Instead of attacking the economic justification offered by Local 100 for the RIF, Plaintiff instead asserts that he was replaced by business agent/organizer Harry Gabbard. *Plaintiff's brief at 15.* Plaintiff attempts to support this assertion by his own affidavit and the affidavit of Art Green. *Plaintiff's affidavit at ¶ 4; Green Affidavit at ¶ 4.* This testimony directly contradicts Plaintiff's prior deposition testimony. Specifically, Plaintiff testified at his deposition that his job duties were assumed by senior organizer Homer Mann **and** Harry Gabbard. *Plaintiff's deposition at 82.* Once again, Plaintiff recognizes that if he was not "replaced", then his argument fails. In his attempt to undo the damage of his deposition testimony, Plaintiff now submits a sham affidavit that directly contradicts his previous deposition testimony.

Art Green states in his affidavit that he had the opportunity to observe Gabbard in his job performance and that Gabbard moved into Plaintiff's office and then concludes that Gabbard replaced Plaintiff. This statement does not present a genuine issue of fact because it is not inconsistent with Plaintiff's deposition testimony that Gabbard and Homer Mann assumed Plaintiff's job duties. *Plaintiff's deposition at 82.* It is also noteworthy that, in concluding that Gabbard assumed Plaintiff's job duties, Green specifically states that:

> After Schweitzer's discharge, Mr. Gabbard immediately took possession in March of 2001 of Schweitzer's office at the Local 100 headquarters in Hamilton County, Ohio, and began working as an organizer performing the same duties Schweitzer had previously performed prior to Schweitzer's discharge.

*Green affidavit at & 4.* Green specifically ties his observation to Gabbard=s duties as an organizer to draw his conclusion that Gabbard replaced Plaintiff. Aside from the fact that this statement is not inconsistent with Plaintiff=s deposition testimony that his job duties were assumed by Gabbard and Homer Mann, Green does not indicate that Gabbard assumed Plaintiff=s other job duties as a maintenance man, strike line captain or office assistant. *Plaintiff=s deposition at 82*; *Plaintiff=s deposition at 57-58.* As important is the fact that Green makes no statements regarding Gabbard=s existing job duties and whether or not he continued to perform them nor does he state whether or not Homer Mann assumed any portion of Plaintiff=s job duties.

A RIF does not occur when an employee is replaced after her discharge. Likewise, an employee is not replaced merely because her job duties are divided among the remaining employees or when her work is assigned to a remaining employee in addition to that employee=s existing job duties. *Barnes v. Gencorp,* 896 F.2d 1457, 1462 (6th Cir. 1990). Aside from the fact that Plaintiff=s deposition testimony clearly and unequivocally establishes that Gabbard and Homer Mann assumed his job duties when he was discharged, Green=s affidavit does not create a material issue of fact as to whether or not a RIF took place because it does not disprove that Homer Mann also assumed Plaintiff=s job duties nor does it show that Gabbard did not assume his portion of Plaintiff=s job duties in addition to his duties as a construction organizer and business agent. *Barnes afidavit at 4.* Accordingly, Plaintiff cannot demonstrate a *prima facie* case, his discharge being part of a RIF, unless he can demonstrate direct, circumstantial or statistical evidence that his

4

discharge was based on his age.

Plaintiff=s inability to come forward with direct evidence that his discharge was based on his age has already been discussed *supra*. Likewise, Plaintiff offers no statistical evidence that his discharge was based on his age. Plaintiff apparently attempts to construct an argument that there is circumstantial evidence that he was discharged on account of his age by asserting that Plaintiff=s discharge permitted the continued employment of a substantially younger person, namely Gabbard. For this argument to work, Plaintiff must show that he and Gabbard were similarly situated employees in all relevant aspects. *Ercegovich v. Goodyear Tire and Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998); *Sahadi v. Reynolds Chemical*, 636 F.2d 1116 (6th Cir. 1980).

First, Plaintiff acknowledged at his deposition that he had no idea what Gabbard=s job duties were[1]. *Plaintiff=s deposition at 70.* Art Green=s affidavit is equally void of any explanation of Gabbard=s job duties at the time of the layoff. While both had job duties as organizers, the facts and circumstances surrounding their individual duties as organizers differed greatly in all relevant aspects. As an organizer, Plaintiff was responsible for filing petitions, holding meetings with potential members, serving as a Astrike line captain@, cleaning toilets, changing the flag at Local 100, getting lunch, and generally doing whatever he was asked to do. *Plaintiff=s deposition at 55-61.* Plaintiff=s organizing duties did not

---

[1] Plaintiff uses his affidavit here to attempt to create an issue of fact by asserting that his and Gabbard=s job duties were similar, if not identical, in all relevant aspects. *Plaintiff=s affidavit at & 4*. This statement is in direct conflict with his deposition testimony and the Court should ignore it.

focus on a specific industry as is evidenced by the companies he helped organize, including a food distributor, a paper company and a building materials supplier. *Plaintiff=s deposition at 59.* Conversely, Gabbard was hired specifically to serve as a business agent /organizer to build and serve Local 100's construction membership in direct response to a 50% drop in Local 100's construction industry membership and a threat from the IBT Central Region, a subordinate body of the International Brotherhood of Teamsters, to remove construction bargaining units from Locals who were experiencing a decline in membership. This threat came at a time when Local 100 could ill afford to loose further membership. *Defendant=s Motion and Memorandum for Summary Judgment at 3; Barnes Affidavit at & 3.* Gabbard was uniquely situated to avert a further decline in Local 100 membership because of his connections to the industry through his father=s construction business and because of his previous employment at Teamsters Local 836, a predominately construction local. *Id.* These differences alone were clearly relevant differences between Gabbard and Plaintiff. *Ercegovich at 352.* In addition, Gabbard often had the ability to obtain recognition from construction employers without the need of an election because he obtained voluntary recognition from the employers he organized a majority of the time, a skill Plaintiff could not boast. *Barnes affidavit at & 4.*

     Equally important to the differences between Gabbard and Plaintiff were Gabbard=s duties as a business agent, which included drafting and negotiating project labor agreements, processing grievances and representing employees in arbitration hearings[2].

---

[2] In yet another attempt to create a sham issue of fact by contradicting his previous deposition

*Barnes affidavit at & 4.* Other disparities in Gabbard=s and Plaintiff=s job duties included cleaning toilets, changing light bulbs, serving as a strike line captain and getting lunch. *Plaintiff=s deposition at 55-61.* In all relevant aspects then, Plaintiff and Gabbard were not similarly situated employees. Therefore, Plaintiff can offer no circumstantial evidence that he was discharged on account of his age by asserting that Plaintiff=s discharge permitted the continued employment of a substantially younger person because he and Gabbard were not similarly situated employees.[3]

### C. There is no evidence that the reasons identified for Plaintiff=s discharge are pretextual.

On the assumption that he can in fact make out a *prima facie* case, Plaintiff asserts that the reasons identified for Plaintiff=s discharge are pretextual by suggesting that Local 100's reason for discharging Plaintiff has changed over time and, apparently, by suggesting that the economic reasons for the layoff had no basis in fact. The evidence of

---

testimony, Plaintiff asserts in his affidavit that he performed these job duties as well, despite the fact that he did not list them when he was asked to describe his job duties and despite the fact that he could barely describe the job functions of a business agent at Local 100 beyond processing grievances. *Plaintiff=s affidavit at && 8, 9; Plaintiff=s deposition at 55-61.*

[3]Of equal importance is the fact that Gabbard=s job was also eliminated as part of the RIF. *Barnes affidavit at & 6.*

record does not show this to be true.

First, Plaintiff notes that several employees received pay increases following his termination. In so noting, Plaintiff ignores the testimony of Local 100 accountant Jim Noe that such increases were automatic increases for Local 100 employees that were tied to increases contained in the National Master Freight Agreement. *Noe deposition at 42.* More importantly, Plaintiff ignores the substantial decline in dues revenue and available cash assets and cash equivalents along with the increase in operating expenses between 1999 and 2000 already cited in Defendant=s Memorandum. *Memorandum in Support of Defendant=s Motion for Summary Judgment at 3.* Plaintiff also ignores cuts in professional fees from $183,399 in 2000 to $89,598 in 2001. *Plaintiff=s Deposition Exhibit 3.* Most significant is the fact that Local 100 was forced to continue to layoff employees in order to reduce its most significant expense: salaries. Between 2000 and 2001, Local 100 laid off a total of six employees which included Harry Gabbard and Heather Meece, age 25. *Memorandum in Support of Defendant=s Motion for Summary Judgment at 5; Bowman deposition at 16; Exhibit 2, attached hereto.* In fact, it is only because of these layoffs and despite a continuing decline in dues revenues of $170,000 from 2001 to 2002 that Local 100 has been able to rebuild its cash assets and its ability to operate from month to month.[4] Indeed, Local 100's expenses for salaries and allowances

---

[4] Based on 2001 annual operating expenses of $2,624,978, Local 100's monthly operating expenses are $218,748/month. By ending the 2002 fiscal year with a cash surplus of $292,131, Local 100 maintains a little over a one month cushion of operating expenses. *Plaintiff=s Deposition Exhibits 3 and 4; Exhibit 6 attached to Memorandum in Support of Defendant=s Motion for Summary Judgment*

have dropped from $1,218,353 in 2000 to $842,090 in 2002, a difference of almost $400,000. *Plaintiff=s Deposition Exhibit 3. This evidence remains unrebutted.* Accordingly, there is no material issue of fact as to the economic justification for the reduction in force.

It is equally obvious that there has been no change in the reason cited by Local 100 for Plaintiff=s discharge. Specifically, Plaintiff argues that Barnes= affidavit at paragraph ten states the reason Plaintiff was selected for layoff over Gabbard. However, a close reading of the affidavit reveals nothing of the sort. Paragraph ten merely describes Plaintiff=s job duties and lack of experience as a business agent. Paragraph 11 cites the reason for Plaintiff=s discharge in clear terms:

> Plaintiff was laid off for economic reasons. Local 100 had suffered a significant decline in membership in the year immediately preceding Plaintiff=s lay off. Dues revenues had declined significantly and Local 100 needed to cut its expenses. Plaintiff was simply the less senior organizer and was not an elected union official nor had he been appointed to fill the term of an elected official.

*Barnes affidavit at & 11.* Local 100's reason for discharging Plaintiff has been and remains that he was discharged as part of a reduction in force due to the local=s economic circumstances.

II      THERE IS NO EVIDENCE TO SUPPORT PLAINTIFF=S ERISA CLAIM

Plaintiff asserts there is evidence to support his ERISA claim arguing that the Julie Ford letter and Art Green=s hearsay affidavit constitute direct evidence of a violation of ERISA Section 510. Plaintiff also argues he can prove a *prima facie* ERISA case based on this same evidence.

9

**A.     The Ford letter is not evidence of a violation of ERISA Section 510 because there was no loss of benefits to which Plaintiff had already become entitled.**

Plaintiff asserts that the Ford letter constitutes direct evidence of a violation of ERISA by Local 100. Plaintiff claims that the letter is direct evidence that Local 100 had a specific intent to violate ERISA when it terminated Plaintiff because it states that Local 100, in discharging Plaintiff, would save the substantial cost of his fringe benefits and that such savings was a motivating factor in deciding to terminate Plaintiff. *Plaintiff=s Memorandum at 26.* While it is true that Plaintiff could have accrued additional benefits had he remained employed, this fact is not a sufficient basis for a Section 510 claim, especially when he does not claim a loss of benefits to which he has already become entitled:

> Here, it is undisputed that no benefits previously earned by Clark will be forfeited by reason of his discharge. Thus, regardless of whether the discharge was arbitrary, its impact upon retirement benefits was only incidental CC the resulting loss was simply that which would result from any discharge. It follows, then, that where the only evidence that an employer specifically intended to violate ERISA is the employee's lost opportunity to accrue additional benefits, the employee has not put forth evidence sufficient to separate that intent from the myriad of other possible reasons for which an employer might have discharged him.

*Rush v. U. Technologies, Otis Elevator Div..*, 930 F.2d 453 (6th Cir. 1991), quoting *Clark v. Resistoflex Co.*, 854 F.2d 762 (5th Cir. 1988). Under Plaintiff=s novel theory, any employee terminated for economic reasons could make out a claim under Section 510 of ERISA by claiming that due to his termination, he will no longer accrue pension benefits.

Other than arguing that Plaintiff received the lowest salary of any employee at Local 100 and ignoring the fact that benefit costs are the same for all employees regardless of

salary, Plaintiff offers no evidence from which the Court could infer the requisite intent necessary to establish his claim. *Barnes deposition at 32.*

> The "something more" which must be shown is a causal link between pension benefits and the adverse employment decision. In order to survive defendants' motion for summary judgment, plaintiff must come forward with evidence from which a reasonable jury could find that defendants' desire to avoid pension liability was a determining factor in plaintiff's discharge.

*Nixon v. Celotex Corp.,* 693 F. Supp. 547, 555 (W. D. Mich. 1988). More importantly, Plaintiff ignores the fact that Local 100 had no reason to interfere with his vested pension benefits because it had no control over nor liability for the payment of his benefits to Plaintiff. *Exhibit 3* **Trust Agreement**; *Barnes affidavit at & 12.* As a multiemployer pension plan qualified under 29 USC ' 1002 *et seq.*, Central States is an entity separate and apart from Local 100 and is governed by the terms of a trust agreement and a board of trustees composed of five union and five employer representatives. Local 100 simply had no control over Plaintiff=s benefits nor was it liable for the payment of Plaintiff=s vested benefits. *Barnes affidavit at & 12.*

What the Ford letter does establish is that each and every employee of Local 100 was entitled to the same $162.00 per week in Pension contributions and $175.70 per week in health and welfare benefit contributions. So the Asubstantial fringe benefit costs@ Plaintiff cites as a basis for his discrimination claim were the same for <u>every</u> employee. In addition, Sarah McFarland=s affidavit clearly and unequivocally demonstrates that pension and health and welfare premiums are paid by Local 100 on a monthly basis, that the contribution rates are the same for all employees, and that coverage for an employee is

11

maintained through the Saturday of the last week he or she works. *McFarland affidavit.* Copies of cancelled checks and forms submitted to Central States verifying these facts are attached to the affidavit covering the period December 29, 2000 through December 29, 2001. McFarland's affidavit clearly demonstrates that Local 100 made all pension and health and welfare payments for Plaintiff and Art Green through the termination of their employment, respectively February 24, 2001 and December 8, 2001. *Id.*

The U.S. District Court said it best in *McClendon v. Continental Group,* 749 F. Supp. 582 (D. NJ 1989):

> The court wishes to emphasize, at the outset, that it finds nothing either illegal or improper in a company estimating its potential pension liabilities in the event of a plant shutdown. No competent management would consider such action without doing so.

*McClendon at 590.* Certainly then, it is proper for an organization to consider the cost of premium payments as part of a reduction in force involving an "at will" employee. Such a consideration does not create an issue of material fact sufficient to withstand summary judgment.

### III. A PLAINTIFF OPPOSING SUMMARY JUDGMENT CANNOT CREATE A MATERIAL ISSUE OF FACT BY SIMPLY CONTRADICTING HIS OWN SWORN TESTIMONY AND BY USING AN AFFIDAVIT CONTAINING DOUBLE HEARSAY.

#### A. Plaintiff cannot create a material issue of fact with his own self contradictory statements.

In his attempt to stave off summary judgment, Plaintiff has submitted an affidavit to demonstrate that there are material issues of fact precluding summary judgment. The insurmountable problem for Plaintiff is that his affidavit directly contradicts his own

deposition testimony on the very issues of fact he claims are material.   For example, Plaintiff submits that he can make out a *prima facie* case of age discrimination by attacking Defendant=s assertion that there was a reduction in force at Local 100:

Plaintiff argues that he was replaced by business agent/organizer Harry Gabbard. For this argument to work, Plaintiff must show that he and Gabbard were similarly situated employees.  (Of course, if Plaintiff were a part time employee of Local 100, it would be impossible for him to show that he and Gabbard were similarly situated).   Plaintiff relies almost completely on his own affidavit in support of this contention.

In his affidavit, Plaintiff unequivocally states AContrary to Defendant=s memorandum at page 2, I was not a part time assistant@.  *Plaintiff=s Affidavit at & 2*.  Meanwhile, the following exchange took place at Plaintiff=s deposition:

> Q.   Okay.  So other than filing petitions, having meetings, being a strike line captain and being a maintenance man, did you have any other duties as an organizer?
>
> A.   Yeah.  Just whatever they would ask me to do I would do.
>
> Q.   Okay.  What B other than what we=ve described here, what other things would they ask you to do?
>
> A.   Run and get them food, do something like that, you know.

*Plaintiff=s deposition at 57-58*.  Plaintiff also states in his affidavit

> In addition, my job duties did not include the occupation of working as a maintenance man, working as an office assistant by cleaning the bathrooms nor getting lunch for union officials.

*Plaintiff=s Affidavit at & 9.*  Aside from the above deposition testimony, which directly contradicts Plaintiff=s statements about being an assistant and getting lunch, Plaintiff=s

13

affidavit also directly contradicts his deposition testimony about being a maintenance man and cleaning toilets:

> Q.  Okay. Other than filing petitions and having meetings with the employees and being a strike line captain, were there any other job duties that you had as an organizer?
>
> A.  **Maintenance man**. [emphasis added]
>
> Q.  Okay. And what did that entail?
>
> A.  Make sure the toilets aren=t running over, plunge the toilets, **clean them. If they had to be cleaned out, you clean them**. Change light bulbs, set up chairs in the meeting rooms. That=s about it. [emphasis added]
>
> Q.  Okay. You can=t think of anything else you did as a maintenance man?
>
> A.  Changed the flag. Make sure the microphones were working in the meeting hall. That=s about it.

*Plaintiff=s deposition at 57*. Plaintiff=s contradictions with his own sworn testimony did not stop here. Plaintiff asserts in his affidavit APrior to my termination, I was aware of the duties performed by [Harry] Gabbard@. *Plaintiff=s Affidavit at & 4*. Yet in his deposition Plaintiff plainly states that he did not know what Gabbard=s job duties were:

> Q.  What did Harry Gabbard do?
>
> A.  Nothing that I know of.
>
> Q.  You don=t know what his job duties were?
>
> A.  He was supposed to be an organizer but he never organized anything.
>
> Q.  Do you know what his job duties were?
>
> A.  No.

*Plaintiff=s deposition at 70*. Despite this testimony, Plaintiff now wishes to testify that he

was aware of Gabbard=s job duties and that they were identical to his own for the sole purpose of fabricating an issue of fact so that he can survive summary judgment.

Plaintiff also uses the affidavit to attempt to gloss over his prior deposition testimony confirming that he was a part time employee of Local 100. In his affidavit, Plaintiff states that he was hired on a full time basis and worked a full day. *Plaintiff=s affidavit at & 3*. Yet, when questioned regarding the accuracy of his personnel form, which was completed with information obtained from Plaintiff following the April 1999 removal of William Wright as president of Local 100, Plaintiff indicated that the information on the form was accurate, **which included a notation of his status as a part-time employee**. *Affidavit of Kim Bales; Plaintiff=s deposition at pp. 52, 100; Plaintiff=s deposition, Exhibit 3 at p. 153; Exhibit 1, attached hereto.*

In his affidavit, Plaintiff states:

At or near the time of my termination I was told by Ken Barnes that I was being paid less than Harry Gabbard because Barnes thought I was only going to be around for a couple of years.

*Plaintiff=s affidavit at & 6.* Conversely, at his deposition, Plaintiff testified as follows:

Q. So would it be fair to say that the reason you believe you were laid off based on your age is the fact that you were laid off instead of Jones, Minnix or Gabbard, and the fact that Cheryl Howard was laid off?

A. Yes.

Q. And it is also fair to say that there is no other fact or document or anything like that that would lead you to conclude that you were laid off on the basis of your age as you sit here today?

A. No, not that I can think of.

15

*Plaintiff=s deposition at 84. See also Plaintiff=s deposition at 83.* Plaintiff clearly views the comment he attributes to Barnes in his affidavit as evidence that he was discriminated against on the basis of his age:

> When all the evidence that is identified herein is combined with the statement made by Barnes to Schweitzer that Schweitzer was being paid less than Harry Gabbard because Barnes thought Schweitzer was only going to be around for a couple of years, creates an issue of material fact as to whether Schweitzer=s discharge was pretextual. (Schweitzer Affidavit at & 6) [sic]

*Plaintiff=s memorandum at 24.* Once again, Plaintiff attempts to create an issue of fact by introducing testimony by way of an affidavit that is wholly inconsistent with his previous deposition testimony. Which version is the Court to accept?

Plaintiff takes this make-it-up-as-you-go-along approach to its extreme when he asserts in his affidavit that he functioned as a business agent and that he negotiated and drafted collective bargaining agreements, processed employee grievances and represented employees in arbitration hearings. *Plaintiff=s Affidavit at & & 8, 9.* At his deposition, Plaintiff was questioned at great length about his work history. *Plaintiff=s deposition at 18-28.* Not once during this questioning did Plaintiff identify ever having been employed by another labor union as a business agent or other similar such position. Likewise, Plaintiff was questioned at great length regarding his job duties at Local 100, much of which has been cited *supra*. *Plaintiff=s deposition at 55-58.* In describing his job duties, not once did Plaintiff indicate that he had any responsibility for negotiating or drafting collective bargaining agreements, processing employee grievances or handling arbitration hearings. Indeed, when questioned, Plaintiff could barely describe the job

duties of a business agent:

>   Q.  Okay.  And it was B What did the business agents do?  What was their job?
>   A.  Well, their job was to go out and settle grievances, meet with the company and settle that grievance, file a grievance.  That=s about it.  Just get it settled down.

*Plaintiff=s deposition at 69.*

>   Q.  Other than what you=ve testified here to today, can you think of any other job duties that a business agent or an officer acting as B acting as a business agent would have?
>
>   A.  I just can=t.  I=m sure there is more things there but I don=t know.

*Plaintiff=s deposition at 70.*

While Fed. R. Civ. Pro. 56 requires a court ruling on a motion to construe the evidence before it in the light most favorable to the non-moving party, the court is not required to turn a blind eye when a non-moving party attempts to fabricate an issue of fact by putting forward an affidavit that is obviously inconsistent with his prior deposition testimony.  *Farrell v. Automobile Club of Michigan*, 870 F.2d 1129 (6th Cir. 1989).

>   If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

*Farrell* at 209 quoting *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984).

Plaintiff was questioned at length and in detail regarding the matters in his affidavit and Plaintiff now wishes to use this inconsistent testimony to create an issue of fact as to whether or not he and Harry Gabbard were similarly situated employees and whether Gabbard replaced him.  Plaintiff=s affidavit is, at best, a self-serving attempt to create an issue of material fact where none would otherwise exist.

>   **B.  The Court should strike and disregard the affidavit of Art Green because it does not satisfy the requirements of Fed. R. Civ. Pro. 56(e).**

To further support his contention that he was replaced by business agent/organizer Harry Gabbard and to support his argument that Local 100 terminated him because it did not want to "pay Schweitzer=s health, welfare and pension benefits", Plaintiff attaches to his memorandum an affidavit signed by former Local 100 business agent Art Green. *Affidavit of Art Green at & 3*. The affidavit primarily relates the substance of a conversation that allegedly took place between Green and former Local 100 Secretary-Treasurer Freddie Kells in which Kells is alleged to have told Green that Plaintiff was laid off because

> "Local 100 did not want to pay Schweitzer=s health, welfare and pension benefits" and that "Local 100 did not intend to pay my [Green=s] pension benefits for the year 2001 and that I would be let go before my pension benefits would be due at the end of the 2001 year."

*Affidavit of Art Green at & 3*. Plaintiff places great reliance on these statements for the truth of the matters they assert. Referring in part to the statements in paragraph three of Green=s affidavit, Plaintiff states "These two pieces of evidence clearly demonstrate that a motivating factor in deciding to discharge Schweitzer was to avoid the payment of pension [sic] and health and welfare benefits on his behalf. *Plaintiff=s memorandum at 26*. Plaintiff relies on these statements for the truth of the matters they assert and, as such, they constitute double hearsay[5]. It is significant that Plaintiff would attempt to introduce the testimony of Freddie Kells by way of an affidavit containing double hearsay, when he had

---

[5] Fed. R. Evid. 801 defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

every opportunity to depose Kells and, in fact, noticed Kells= deposition during the discovery phase of this litigation and never followed through with the deposition. *Exhibit 5, attached hereto.*

Fed. R. Civ. Pro. 56(e) provides in relevant part as follows:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

Hearsay evidence such as Green=s affidavit is not admissible and cannot be considered on a motion for summary judgment. *Daily Press, Inc. v. United Press Int'l*, 412 F.2d 126, 133 (6th Cir.), *cert. denied*, 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453 (1969); see also *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988) (stating that "[i]t is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment").  Accordingly, the Court should strike and disregard the affidavit of Art Green.

### IV.    CONCLUSION

For the foregoing reasons, it is clear that Plaintiff can offer no direct evidence of unlawful discrimination nor can he make out a *prima facie* case.  Likewise, Plaintiff is equally unable to support his claim for a violation of ERISA '510.

Accordingly, Defendant respectfully requests that it=s Motion for Summary Judgment be granted and that this matter be dismissed with prejudice at Plaintiff=s cost.

Respectfully submitted,

        s/Karl E. Williamson
        Ohio S. Ct. Reg. No.  0047204
        Counsel for Defendants
        Suite 904, Highland Towers
        1071 Celestial Street
        Cincinnati, Ohio 45202
        513-621-8688
        513-621-3873 Fax
        kewilliam@fuse.net

## **CERTIFICATE OF SERVICE**

    I hereby certify that on _____, I electronically filed the foregoing with the Clerk of Courts using the CM/EFC system which will send notification of such filing to the following: Mark J. Byrne, Esq., Counsel for Plaintiff at 2200 Kroger Building, 1014 Vine Street, Cincinnati, Ohio 45202.

        s/Karl E. Williamson
        Ohio S. Ct. Reg. No.  0047204
        Counsel for Defendants
        Suite 904, Highland Towers
        1071 Celestial Street
        Cincinnati, Ohio 45202
        513-621-8688
        513-621-3873 Fax
        kewilliam@fuse.net