# LOGOTHETIS, PENCE & DOLL
### ATTORNEYS AT LAW

SORRELL LOGOTHETIS
JOHN R. DOLL
SUSAN D. JANSEN
JULIE C. FORD
DIANA S. BROWN
D. JAMES PETROFF
MICHAEL A. McNEW

111 WEST FIRST STREET, SUITE 1100
DAYTON, OHIO 45402-1156
TELEPHONE (937) 461-5310
FACSIMILE (937) 461-7219
lpd@logolaw.com

BRUCE E. PENCE (1943-1999)

OF COUNSEL
BEVERLY A. MEYER

October 8, 2001



Helen B. Glutz
Cart Team Leader
Equal Employment Opportunity Commission
550 Main St., Room 10-019
Cincinnati, OH 45202-5202

   RE: Teamsters Local Union No. 100 (Thomas "Tim" Schweitzer); Charge No. 221A10769

Dear Ms. Glutz:

   I represent Teamsters Local Union No. 100 ("Local 100" or "the Union"),[1] the Respondent in the above-referenced case filed by former Local 100 employee Thomas "Tim" Schweitzer. This letter is to provide you with the requested position statement from the Union and with supporting evidence. I am also enclosing a signed form declining to engage in mediation of this matter.

   The Union believes this charge, alleging that Mr. Schweitzer's March 2001 lay-off was the product of age discrimination, should be dismissed without further proceedings because it is without merit. The following will set forth the background of Mr. Schweitzer's employment at Local 100 and of his lay-off.

   Local 100 is an unincorporated, not-for-profit association that operates as a labor organization as defined in the National Labor Relations Act. It represents employees in the Greater Cincinnati area in both the public and private sectors for purposes of collective bargaining, with its offices in Evendale, Ohio. The membership ranks of Local 100 vary because of seasonal employment patterns as well as because of the vagaries of the local and national economy and employment market. Currently, the Local Union has approximately 5200 members; within the past few years, its membership had at one time reached a high of approximately 6100 members.

   The Local Union's operations are governed by its bylaws and by the Constitution of its parent organization, the International Brotherhood of Teamsters ("IBT"). A seven-member Executive Board consisting of four officers – the President, Vice-President, Secretary-Treasurer and Recording Secretary – and three Trustees, governs its affairs. The members of the Executive

---

[1] The formal name of the Respondent is Truck Drivers, Chauffeurs and Helpers Union Local No. 100, affiliated with the International Brotherhood of Teamsters; it is usually referred to as Teamsters Local 100, which is how it is named in the charge.

674

Helen B. Glutz, EEOC Cart Team Leader
October 8, 2001, Page 2

Board and seven Business Representatives are elected directly by the membership of the Local Union every three years. The President, Vice-President and Secretary-Treasurer work full-time for the Local Union (the other four Executive Board members have only part-time duties) and share some of the same duties as its Business Representatives (also referred to as Business Agents or "BAs"). The BAs are responsible for negotiating and administering collective bargaining agreements, meeting with members and employers on a regular basis, processing employee grievances, presenting grievances at arbitration hearings, conducting strikes and other concerted activity and performing similar duties on behalf of the Union's members. The Union sometimes employs appointed Business Representatives, in addition to those who are elected, depending upon the size of the membership and the workload. Currently, the Local Union has one appointed Business Representative, one who has been appointed to fill an unexpired, elected term and one appointee who has combined duties as a Business Representative and other duties, as will be discussed further.

The Local Union also employs one or more appointed organizers whose duties are to build the Union's membership by organizing new bargaining units. This involves both actively recruiting groups of employees and assisting groups who contact the Union seeking representation. An organizer files representation petitions with the National Labor Relations Board or State Employment Relations Board, holds meetings with employees, prepares and distributes campaign literature and conducts handbilling, picketing and other activities associated with a union election campaign. Generally, an organizer's duties end when the employees have voted for union representation; after the Union is certified as the bargaining agent, a Business Representative is assigned to represent the employees and negotiate a contract with the employer. Organizers at Local 100 generally do not perform any of the same duties as the BAs, although there is occasionally some overlap such as during a major strike, when all employees are expected to participate in picketing or similar activities. Similarly, organizers may file unfair labor practice charges with the appropriate agency relating to employer misconduct during an organizing campaign, while business agents may process similar charges that relate to unfair practices after the Union has been certified as the bargaining agent. The only instance of an organizer performing true business representative duties of which the current officers are aware involved a former organizer who previously had served a term as a business representative; the then-President of the Local assigned him to negotiate a very small number of contracts for groups he had organized.

It is relatively unusual for a local union to have an organizing department or to employ even one full-time organizer, much less more than one. (The Ohio Conference of Teamsters and the IBT both provide assistance to local unions with organizing efforts.) Most Teamster locals that are engaged in active organizing simply assign one or more business agents to include organizing among their other duties. Local 100 believes it may be the only one out of some two dozen Teamster locals in the State of Ohio to employ a full-time organizer, which is considered something of a luxury.

Mr. Schweitzer was appointed as an organizer for Local 100 in February 1999 by then-President Bill Wright. Under section 8(A) of the Union's by-laws, pertinent portions of which are

Helen B. Glutz, EEOC Cart Team Leader
October 8, 2001, Page 3

enclosed, an organizer such as Mr. Schweitzer may be hired or terminated at the sole discretion of the Union's President. Mr. Schweitzer had been a member of Local 100 for approximately 20 years and, as the current officers understand, was disabled from performing his former work as a truck driver. The Local Union officers – none of whom were involved in Mr. Schweitzer's hiring but some of whom were employed by the Union or were on the Executive Board at the time –believe he is and was receiving workers' compensation or other benefits because of this disability. Accordingly, he received a minimal salary; at the time of his lay-off he was being paid approximately $246 per week. This salary is less than that of the business agents or the head organizer; it was set by the Union's former President, Mr. Wright.

The current officers understood that Mr. Wright hired Mr. Schweitzer in order to allow him to obtain additional years of credit toward a pension. He previously had worked as driver under the National Master Freight Agreement, a national, multi-employer collective bargaining agreement that provides retirement benefits through a multi-employer plan known as the Central States, Southeast & Southwest Area Pension Fund. The employees of Local 100 and of many other Teamster local unions also participate in this pension plan. The Centrals States plan calculates benefits based on the participant's years of contributory service and provides for enhanced benefits when a participant has attained 20, 25 or 30 years of service. Apparently, Mr. Schweitzer needed some additional years of contributory credit to obtain increased benefits.

Mr. Schweitzer had been an active Union member but had not been a paid employee, as either an organizer or an agent, before his appointment in early 1999. When he was no longer able to work as a driver, he began volunteering part-time, assisting the Local's full-time organizer. Eventually, he began volunteering almost full-time and had been working as a volunteer for about six months before he was hired as a paid employee. Mr. Schweitzer worked under the direction and supervision of Junior Mann, the Union's long-time organizer. Mr. Mann – who is 56 years of age – is a highly experienced organizer who has been employed full-time at Local 100 for nine years; for most of that time, he has been the Union's only paid organizer. For much of the first year of Mr. Schweitzer's employment at the Local Union, he simply received training and assisted Mr. Mann with tasks such as preparing and distributing handbills and other campaign materials and meeting with prospective members. Eventually, Mr. Schweitzer was permitted to file representation petitions and to conduct some employee meetings on his own; in late 2000 and early 2001 he also assisted Teamsters Local 661, a much smaller local union with no organizer and no campaign experience, with its organizing efforts. However, he continued to work under Mr. Mann's close supervision. Furthermore, he performed none of the duties of a business representative, such as negotiating contracts, meeting with employers regarding discipline and other day-to-day matters, processing grievances or presenting grievances at arbitration hearings.

Local 100 has been experiencing a downturn in its financial condition, due both to increased costs and to decreased membership[2] arising in part from lay-offs in the industries in which its members are employed. I am attaching the monthly Trustees' Reports – monthly

---

[2] Local 100's income is derived almost exclusively from dues paid by its members.

676

Helen B. Glutz, EEOC Cart Team Leader
October 8, 2001, Page 4

financial statements reviewed and approved by the Union's elected trustees that provide a snapshot of the Local's financial status each month – for the month of February in the years 1999, 2000 and 2001. These reports show the Local's financial condition in February 2001, the month before Mr. Schweitzer's lay-off, compared to the same month in the preceding years. The following chart summarizes the total income, expense and net proceeds for each of those months.

|  | Receipts | Expenses | Net Gain/(Loss) |
|---|---|---|---|
| February 1999 | $233,306 | $203,248 | $30,058 |
| February 2000 | $242,787 | $241,316 | $ 1,471 |
| February 2001 | $205,017 | $205,390 | ($ 373) |

As you can see, the Local's monthly income declined rather significantly in the two years between Mr. Schweitzer's hiring and his lay-off, while its expenses – the largest elements of which are the salaries, expense allowances and benefit contributions for employees – had risen slightly.

In addition, I am enclosing a copy of a "variance report" prepared by the Local Union's certified public accountants in January 2001; it also contains handwritten notes from a conference with the auditor. (The trustees' reports are available to all Local 100 members to review; however, the variance report is prepared by the accountants for the use of the Executive Board in its budget planning and is not generally made public. Accordingly, the Local Union requests that this document be treated as confidential.) The variance report compares the Local's receipts and expenses for the year 2000 with the same categories in 1999 and 1998. Page 1 of the report shows that the Local Union's 2000 expense for salaries and wages (referred to as "regular earnings") had risen by 6.46% and its costs for expense allowances had risen by 24% over 1999, for combined total increase of $114,831. Similarly, as shown on page 2, the costs of contributions and premiums for insurance, pensions and other fringe benefits had risen by $46,369 over the past year, or 16.83%. At the same time, as shown on page 6, dues and initiation fees were down by a total of $81,596, or 3.31%.

In February 2001, Local 100 laid off its most recently hired clerical staff member to reduce its personnel expenses. However, the Union needed to cut expenses further. It was decided by President Ken Barnes, in consultation with Secretary-Treasurer Freddie Kells, that the organizing department was the most reasonable place to reduce costs, and Mr. Schweitzer was laid off by letter dated March 16, 2001, effective March 26. Laying off Mr. Schweitzer saved not only his relatively small salary but also his substantial fringe benefit costs. The Local Union currently contributes $162.00 per week for Central States pension benefits and $175.70 per week for health and welfare benefits for each employee. (These rates, which increase annually, are the same as those established for Union members who work under the National Master Freight Agreement, pertinent portions of which are attached). Mr. Schweitzer also received a monthly car allowance of $321.27. Accordingly, at current rates Local 100 would incur total costs of $34,231.04 per year for Mr. Schweitzer's salary and benefits, not including payroll taxes.

677

It is true that there currently are three employees at Local 100 who were hired after Mr. Schweitzer; these individuals are Dave Minix, age 52, and Alan Jones, age 48, both hired on November 2, 1999, and Harry Gabbard, age 46, hired March 16, 2000. However, it is not true that Mr. Schweitzer was capable of performing their duties, as he alleges in his charge, nor is there any basis for his claim that one of these individuals – all of whom have different job titles and different duties than Mr. Schweitzer – should have been laid off rather than him.

Mr. Jones and Mr. Minix were appointed as business agents in the fall of 1999, when the Local Union was busier and in a stronger financial position. At that time, one of the Union's seven elected BA positions was vacant, as former Business Representative Ken Barnes recently had been appointed as President.[3] Both of them had worked as shop stewards within their own bargaining units – with responsibility for grievance processing and other duties similar to business agents – for many years before being hired by the Union, and they were appointed as Business Representatives to represent bargaining units in their own areas of experience. For example, Dave Minix was a long-time shop steward for over-the-road drivers at Roadway Express and was appointed to work primarily with Roadway and other freight-industry bargaining units.

In March 2000, Harry Gabbard was appointed as a combination business representative and organizer. He formerly had been a volunteer representative at Teamsters Local 836 in Middletown (a much smaller local that was merged into Local 100 in 1997), where he worked in bargaining units in the construction industry. He was hired at Local 100 because of his construction experience and his familiarity with the members and employers from the former Middletown local. He has been assisting the two BAs – Art Green and Tom Kinman – who currently handle construction units, as Mr. Green will be retiring at the end of December and Mr. Kinman within the next few years. With this work and his experience at Local 836, Mr. Gabbard will be able to handle construction industry bargaining units (an area in which Mr. Schweitzer has no background or experience). Mr. Gabbard also has assisted Mr. Mann, the full-time organizer, particularly when large campaigns are underway. However, the bulk of his time has been spent in tasks done by Business Agents; he has performed various duties assigned by President Barnes, including negotiating some collective bargaining agreements.

As noted, the Business Representatives' duties are significantly different from those of Mr. Schweitzer as an organizer, and Mr. Schweitzer did not have the knowledge or experience to

---

[3] Local 100's officers are elected by the membership; however, Mr. Barnes and Mr. Kells were appointed in accordance with the bylaws after their predecessors resigned and retired, respectively. A person appointed to complete the unexpired term of an officer or Business Representative ha the same rights as if he or she were elected. Accordingly, although two business representatives were appointed in November 1999, only one has the status of an appointee. While an appointed employee may be terminated at the will of the President, an elected representative may be terminated only after being charged with a violation of the IBT Constitution or Local by-laws and found guilty through a hearing before the Local's Executive Board or a hearing panel constituted by a higher body within the IBT.

Helen B. Glutz, EEOC Cart Team Leader
October 8, 2001, Page 6

do those jobs.[4] In addition, by the time the decision was made in March 2000 to lay off Mr. Schweitzer, each of them had been working and gaining experience in the complete range of business representative duties for more than a year.

Mr. Barnes deemed that the Business Agents and Mr. Gabbard, who provide direct services to the Union's existing members, were more critical to the Union's operations than a second organizer. In addition, two of the Union's current BAs (Mr. Green and Larry Gibson) are retiring at the end of this year. The Local Union is currently in the midst of an election (being conducted by mail) for officers and business representatives to take office for new, three-year terms beginning January 1, 2002. All of the current, elected BAs are running for reelection, and Mr. Jones and Mr. Minix are running for the two elected positions that are being vacated by the two retiring Business Representatives. The Local currently employs eight Business Representatives and one combination BA for a total of nine; after the election and the retirements effective December 31, it will employ only eight (the seven elected BAs and Mr. Gabbard), resulting in an automatic cost savings without lay-offs.

The Local Union quite clearly had a legitimate and non-discriminatory business reason for laying off Mr. Schweitzer. There is absolutely no direct evidence of discriminatory intent and no other evidence that the financial circumstances that formed the basis of Local 100's decision to lay him off were a pretext for discrimination on the basis of age. (I would note that the appointed BAs and BA/organizer who were retained and whom Mr. Schweitzer claims as comparators were all within the protected age group, with the oldest one being 52 compared to Mr. Schweitzer's age of 61. The decision-makers in this situation were the President, Mr. Barnes, age 46, and the Secretary-Treasurer, Mr. Kells, age 55. In addition, Mr. Schweitzer himself was hired shortly before he reached age 59; he continued to work for more than a year and a half after the Local's current principal officers were appointed in September 1999, all of which suggests that the Union's administration had no animus on the basis of age.)

The current Local 100 officers have learned that, since his lay-off, Mr. Schweitzer has been supporting a slate of candidates for Local Union office that opposes the slate that includes Mr. Barnes and Mr. Kells. They believe that Mr. Schweitzer's charge – filed on August 23,

---

[4] Because of his very different duties and lack of experience, there was never any consideration given to moving Mr. Schweitzer into a BA position and laying off one of the Business Representatives in his stead. However, it should be noted that such a move would be detrimental to the Local's operations, as it is disruptive to the employees in a bargaining unit and to the relationship with an employer when the Union representative assigned to the group is changed. Although the agents sometimes are reassigned to one group or another, there obviously would be substantial disruption from the wholesale reassignments that would result from displacing a BA with an organizer. The Local Union also was mindful of the fact that a lay-off of a Business Representative who is responsible for providing direct services to members would be an unpopular action among the membership. Finally, the time involved for Mr. Schweitzer to learn the job duties of a BA and to become familiar with the relevant collective bargaining agreements and employee units also would make such a change difficult.

Helen B. Glutz, EEOC Cart Team Leader
October 8, 2001, Page 7

more than five months after the date of his lay-off and just three weeks before the ballots for the Union elections were mailed to the members on September 14, 2001 – was filed <u>not</u> in the good faith belief that his lay-off was discriminatory but in order to damage the current officers politically during an election campaign.

      Accordingly, the Respondent Teamsters Local 100 respectfully requests that Mr. Schweitzer's charge be dismissed as without merit. Thank you for your consideration of this matter; please feel free to contact me if I can provide any further information.

Very truly yours,

Julie C. Ford

JCF/mkr
Enclosures
cc: Ken Barnes, President, Local 100

680