RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0272p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

THOMAS A. SCHWEITZER,

    *Plaintiff-Appellant,*

v.

TEAMSTERS LOCAL 100,

    *Defendant-Appellee.*

No. 04-3220

C-1-02-052

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 02-00052—Timothy S. Hogan, Magistrate Judge.

Argued: April 26, 2005

Decided and Filed: June 21, 2005

Before: KEITH, CLAY, and FARRIS, Circuit Judges.[*]

_____

COUNSEL

**ARGUED:** Mark Joseph Byrne, JACOBS, KLEINMAN, SEIBEL & McNALLY, Cincinnati, Ohio, for Appellant. David M. Cook, LAW OFFICE OF DAVID M. COOK, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Mark Joseph Byrne, JACOBS, KLEINMAN, SEIBEL & McNALLY, Cincinnati, Ohio, for Appellant. Karl Williamson, Cincinnati, Ohio, for Appellee.

_____

OPINION
_____

    KEITH, Circuit Judge. Plaintiff Thomas Schweitzer ("Schweitzer") alleges that Defendant Teamsters Local 100 ("Local 100") terminated his employment with the union in an effort to avoid the payment of his pension, health, and welfare benefits, in violation of Section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140. Though Local 100 may have considered the cost of pension and health insurance premiums in deciding whether to lay off employees, we find that the union exhibited no desire to avoid pension liability through Schweitzer's termination. Local 100's evidence sufficiently indicates that any desire to avoid the payment of benefits was not central to their decision to terminate Schweitzer, and Schweitzer fails to rebut their assertion. We therefore find it reasonable to conclude that Local 100 did not violate Section 510 of ERISA, and AFFIRM the district court's grant of summary judgment for Local 100 in this regard.

---

    [*]The Honorable Jerome Farris, Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

## I. Background

In February of 1998, at the age of 58, Thomas Schweitzer began volunteering as an assistant organizer for Local 100 after suffering an injury that prevented him from continuing his work as a truck driver. Roughly one year later, Schweitzer was hired by the union as a part-time assistant organizer and was assigned to work under Homer Mann ("Mann"). As part of Schweitzer's employment compensation and benefits package, Local 100 made weekly contributions to a health and pension fund on his behalf in the amount of $175 per week for health insurance benefits and $162 per week for pension benefits.

In recent years, the power and membership of unions has decreased significantly as a result of various economic, social, and structural forces. *See* Matt Bai, *The New Boss*, N.Y. Times, Jan. 30, 2005, at Sec. 6 (explaining the ongoing decline of current union membership in the United States). For Local 100, as with other similarly situated union chapters, a decline in membership beginning in 1999 led to a large loss of membership revenues, which was coupled by a corresponding increase in operating expenses. In particular, membership dues paid to Local 100 decreased nearly a quarter of a million dollars between 1999 and 2001, falling from $2.67 million in 1999, to $2.57 million in 2000, and to $2.42 million in 2001. Concurrently, the total operating expenses increased by roughly $200,000 over the same period of time, rising from $2.7 million in 1999, to $2.9 million in 2000.

When Alan Barnes ("Barnes") became President of Local 100 in July 2000, he met with Local 100's accountant, Jim Noe ("Noe"), to discuss the chapter's financial condition and determine ways to address the problem. In response, Noe noted that staff salaries and other professional fees were the chapter's two most significant and largest expenses.

Barnes responded by cutting Local 100's professional expenses. As a result, the union's expenses declined by $93,000 between 2000 and 2001. These cuts, however, were not sufficient to address the growing gap between revenue and expenses facing Local 100. Barnes next began layoffs of Local 100 union employees, whose salaries and benefits comprised 55% of Local 100's overall expense budget. But because a large number of the employees at Local 100 are elected to their positions by union members, most were only subject to removal if they violated Local 100's bylaws or the Teamsters' Constitution. As such, Barnes was faced with a limited pool of potential employees who were eligible for termination.

Barnes began making the cuts in February 2001, terminating eligible staff members in order of seniority. The first employee to be released was Cheryl Howard, a clerical employee with the least seniority. In March 2001, Barnes made the decision to lay off Schweitzer, then 61 years old, who at the time was the union organizer most recently hired. Several other employee layoffs followed and continued until Local 100 was able to re-establish the chapter's financial security in January 2002.

Schweitzer filed an age discrimination claim with the Equal Employment Opportunity Commission ("EEOC") shortly after he lost his job. In response to a request by the EEOC seeking an explanation for Local 100's decision to layoff Schweitzer, the attorney for the union prepared a letter stating in detail the reasoning behind the termination. An excerpt of the letter provides:

> In February 2001, Local 100 laid off its most recently hired clerical staff member to reduce its personnel expenses. However, the union needed to cut expenses further. It was decided by President Ken Barnes, in consultation with Secretary-Treasurer Freddie Kells, that the organizing department was the most reasonable place to reduce costs, and Mr. Schweitzer was laid off by letter dated March 16, 2001. . . .

The letter explains further:

> Laying off Mr. Schweitzer saved not only his relatively small salary but also his substantial fringe benefit costs. The Local Union currently contributes $162.00 per week for Central

States pension benefits and $175.70 per week for health and welfare benefits for each employee. (These rates, which increase annually, are the same as those established for Union members who work under the National Master Freight Agreement . . . ). Mr. Schweitzer also received a monthly car allowance of $321.27. Accordingly, at current rates Local 100 would incur total costs of $34,321.04 per year for Mr. Schweitzer's salary and benefits, not including payroll taxes.

Joint Appendix ("J.A.") at 256.

The EEOC complaint was subsequently dismissed and Schweitzer filed this lawsuit, alleging in part that the union chapter's decision to discharge him constituted a discriminatory interference with his right to benefits under § 510 of ERISA, 29 U.S.C. § 1140 *et. seq.*[1] The district court granted Local 100's motion for summary judgment, holding that, with regard to the ERISA claim, Schweitzer failed to produce any significant evidence to rebut Local 100's contention that his termination was necessary given the chapter's economic difficulties. Schweitzer filed a timely appeal of that decision.

## II. Discussion

We review a district court's grant of summary judgment de novo. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1113 (6th Cir. 2001). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Section 510 of ERISA states: "It shall be unlawful for any person to discharge . . . a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the [employee benefit] plan." 29 U.S.C. § 1140. In order to state a claim under § 510, Schweitzer must demonstrate that Local 100 had a specific intent to violate ERISA through either direct or circumstantial evidence. *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997). This Court defines direct evidence as "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). In other words, "direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003).

In the absence of direct evidence, Schweitzer must "state a *prima facie* case by showing the existence of (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employer may become entitled." *Id.* Following the presentation of such evidence, Local 100 is able to "rebut the presumption of impermissible action . . . by introducing 'evidence of a legitimate, nondiscriminatory reason for its challenged action.'" *Id.* (citing *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir. 1992). Schweitzer must then show that Local 100's explanation was pretextual. *Ameritech*, 129 F.3d at 865. Summary judgment is appropriate if Schweitzer does not present direct evidence, or "fails to establish a prima facie case or . . . to rebut the employer's proffer of a legitimate, nondiscriminatory reason for its actions." *Id.*

In addition, in submitting a claim under § 510, the plaintiff is required to demonstrate a "causal link" between the adverse employment decision and the loss of benefits. *Id.* (citing *Humphreys*, 966 F.2d at 1044). In particular, "in order to survive [a] defendant's motion for summary judgment, [the] plaintiff must

---

[1] Schweitzer's complaint also alleged that he was terminated from his position because of his age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 626 *et. seq.*, and Ohio public policy. He does not address those claims in his appeal to this court, and as such, we consider them to be waived. *Brindley v. McCullen*, 61 F.3d. 507, 509 (6th Cir. 1995).

come forward with evidence from which a reasonable jury could find that the defendants' desire to avoid pension liability was a determining factor in [the] plaintiff's discharge." *Humphreys* at 1044. Thus, unless the issue of benefits is shown to be causally linked to the employer's decision to terminate an employee, the termination decision will not violate § 510 of ERISA. *See Mattei v. Mattei*, 126 F.3d 794, 808 (6th Cir. 1997) (requiring that under § 510, a plaintiff must produce evidence indicating a causal connection between a defendant's challenged action and its interference with plaintiff's ability to receive an identifiable benefit).

Schweitzer offers little proof to show that Local 100 terminated his employment in order to avoid the payment of pension, health, and welfare benefits on his behalf. The primary piece of evidence he submits is the letter written by Local 100's attorney to the EEOC, excerpted above, which lists the cost of maintaining Schweitzer's health and welfare benefits as one reason for Schweitzer's termination, but also emphasizes the union's primary goal of reducing expenses as the motivating factor in its decision. The attorney's letter lists other costs saved by the decision to lay off Schweitzer, such as his salary and car allowance. It also notes that, prior to Schweitzer's termination, Local 100 may have been the only Teamsters chapter in the area to employ a full-time organizer, calling it "something of a luxury." J.A. at 256.

This court finds that this letter is not sufficient to serve as direct evidence that Schweitzer was terminated from his job so that Local 100 could avoid paying benefits on his behalf. Though it shows that in deciding to lay off Schweitzer, Local 100 considered the cost of pension and health insurance premiums, it does not produce or indicate the requisite causal link between his termination and the union's desire to avoid pension liability. Instead, the letter indicates that Schweitzer's termination was motivated as part of a broad, overall effort to cut expenses by systematically laying off union staff, making the issue of payment to the benefit fund merely incidental to the union's decision to terminate Schweitzer.

A second potentially harmful piece of evidence that Schweitzer submits is an affidavit from Art Green, a former business agent for Local 100. Green's relevant testimony is one statement regarding a conversation that took place between Green and Freddie Kells, the Secretary-Treasurer of Local 100. During the conversation, Green recounts only that Kells stated that Schweitzer had been let go in March 2001 because Local 100 did not want to pay Schweitzer's health, welfare and pension benefits. J.A. at 278-79.

The district court considered Green's account of his conversation with Kells to be hearsay; a decision that Schweitzer now appeals that decision to this court. We review the district court's determination of whether testimony is inadmissible hearsay for abuse of discretion. *United States v. Kahlil*, 279 F.3d 358, 363 (6th Cir. 2002) (citing *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 716 (6th Cir. 1999)).

Schweitzer contends that this statement qualifies as an admission against a party pursuant to Rule 801(d)(2)(A), (C), or (D) of the Federal Rules of Evidence. Rule 801(d)(2) states that the statement at issue is not hearsay if it is offered against a party and is:

> (A) the party's own statement in either an individual or a representative capacity or . . . (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, . . . . The contents of the statement shall be considered but are not alone sufficient to establish the declarant's authority under subdivision (C), the agency or employment relationship and scope thereof under subdivision (D).

Fed. R. Evid. 801(d)(2).

We find that the statement does not fall within the meaning of Rule 801 (d)(2)(A), which requires that the statement at issue be the party's own statement, either in his individual or representative capacity. The comment at issue, on its face, is not Kells's own statement. According to Green, Kells referred to

"Local 100" in general and not to a specific person, and does not attribute the statement to himself as Secretary-Treasurer.

The statements may, however, fulfill the requirements of 801(d)(2)(C) or (D). Schweitzer presents no evidence to indicate, nor does he argue, that Kells had the authority as Secretary-Treasurer to make any statement concerning the reasoning behind Local 100's decision to terminate him. He also does not attempt to show that Kells's ability to make such a statement on behalf of the union is a matter within the scope of his position as Secretary-Treasurer. Nevertheless, it is reasonable to surmise that a Secretary-Treasurer of a union has the authority to make a statement on behalf of the union, or that a matter regarding a decision to terminate an employee falls within the scope of that position. Indeed, in the letter discussed above, the attorney for Local 100 notes that President Barnes "in consultation with Secretary-Treasurer Freddie Kells," decided that the organizing department was the most reasonable place to cut expenses, leading Barnes to lay off Schweitzer. J.A. at 256.

In addition, the district court's order offers no explanation as to why it concluded that the statement in Green's affidavit was "clearly hearsay." J.A. at 247. Absent such explanation, and given our review of Rule 801(d)(2) of the Federal Rules of Evidence, we are inclined to conclude that the district court abused its discretion in not adequately addressing its reasons for ignoring the Green affidavit.

Nevertheless, neither the Green affidavit nor the letter to the EEOC are enough to support a prima facie case under § 510 of ERISA. While we do not necessarily require a plaintiff to prove the "causal link" between the defendant's alleged illegal activity and his ability to receive benefits at this stage, *Ameritech*, 129 F.3d at 865, we do require a plaintiff's prima facie case to demonstrate "not only that [the plaintiff] has lost the opportunity to accrue new benefits, but also that [the defendant] had the specific intent of avoiding ERISA liability when it discharged him," *Majewski*, 274 F.3d at 1113. To hold otherwise would allow "every employee discharged by a company with an ERISA plan [to] have a claim under § 510." *Id.*

The explanation that Local 100's attorney offers for Schweitzer's termination indicates only that Schweitzer's benefit payments, which were the same for all employees, were one of many factors considered when the union was seeking ways to cut costs. And while Green's affidavit includes a paraphrased statement by Kells indicating that the union considered benefits costs in deciding when to lay off certain employees, it does not indicate when the conversation took place, offer further details about the context of the conversation, including what, if any, questions Kells may have been responding to, and does not offer a direct quote of Kells's statement. The paraphrased statement, without further context or explanation, does not on its own show that the benefits were the "determining factor in [the] plaintiff's discharge." *Humphreys* at 1044. Indeed, "[t]he mere fact that [an employee's] termination would save [the employer] money in pension costs . . . is not sufficient to prove the requisite intent" in making a prima facie case under § 510. *Johnson v. Square D. Co.*, 1992 U.S. App. LEXIS 27171, at *5 (6th Cir. Oct. 15, 1992) (citing *Conkright v. Westinghouse*, 933 F.2d 231, 239 (4th Cir. 1991) ("[I]t is not sufficient for an employee to allege lost opportunity to accrue additional benefits as evidence of the employer's specific intent to violate ERISA.")). *see also Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1224 (11th Cir. 1993) ("[M]easures designed to reduce costs in general that also result in an incidental reduction in benefit expenses do not suggest discriminatory intent."); *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988) ("Section 510 protects employees from conduct designed to deprive them of rights created under employee benefit plans; it does not cast liability on an employer for" making nondiscriminatory business decisions.); *cf. May v. Shuttle, Inc.*, 129 F.3d 165, 171 (D.C. Cir. 1998) ("[T]he undisputed evidence shows that [Defendant] furloughed plaintiff[] in order to cut costs . . . Plaintiff[] ha[s] presented no evidence to show that [Defendant] was motivated by any other factor. Because plaintiff[] cannot show a specific intent to discriminate, [he] ha[s] failed to establish a prima facie case.").

Even if this court were to conclude that Schweitzer established a prima facie case under § 510, however, Local 100 meets its burden of producing a legitimate, nondiscriminatory reason for its decision to lay off Schweitzer. The union's accountant testified that Local 100 had suffered a 50% drop in cash assets

and a significant drop in revenues, and informed President Barnes that salaries and professional fees were the union's two biggest expenses. Local 100 lost nearly a quarter of a million dollars in two years as a result of a reduction in membership dues. Faced with a limited pool of potential employees he was able to layoff, Barnes terminated staff in order of seniority, beginning with a clerical employee. Other employee layoffs followed, including Schweitzer, and continued until Local 100 re-established the chapter's financial security.

All of this evidence, even viewed in a light most favorable to Schweitzer, leads this court to conclude that the union's ability to discharge the cost of Schweitzer's benefits was merely incidental to a much larger effort to cut costs out of economic necessity. Schweitzer, as required under this court's evaluation of circumstantial evidence under § 510, fails to produce any additional evidence that could reasonably rebut this conclusion. Most significantly, Schweitzer argues that if the union was sincerely working to reduce expenses and terminating employees in order of seniority, other employees would have been let go prior to his termination. Schweitzer points to one coworker, Harry Gabbard, who was also an organizer with Local 100 and was hired more recently than Schweitzer. Yet Gabbard, according to President Barnes, had significantly more expertise than Schweitzer, including experience working in the construction industry and performed additional duties that Schweitzer did not perform. In addition, Gabbard was terminated a few months after Schweitzer, and thus also lost his job as part of the union's overall effort to cut expenses. Thus, absent more compelling evidence, we conclude that Schweitzer fails to effectively rebut the union's legitimate reason for his termination.

### III. Conclusion

Local 100 contends that their predominant motivation in laying off Schweitzer and other employees was to address serious financial difficulties that threatened the survival of the union chapter. Schweitzer submits no evidence to adequately show that Local 100 terminated his employment with a specific intent to avoid pension liability. Instead, the evidence submitted by both sides suggests that the union's desire to avoid the payment of benefits was merely incidental to the union's decision to terminate Schweitzer. We therefore AFFIRM the district court's decision to grant summary judgment for Local 100 on Schweitzer's ERISA claim.